UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| CHERY A. LUCERO, | ) | CIV. 09-5063-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER GRANTING IN PART |
| | ) | AND DENYING IN PART |
| JAMES G. BUSH, Chief of Police, | ) | DEFENDANTS' MOTION |
| Sturgis Police Department, | ) | FOR SUMMARY JUDGMENT |
| individually and in his official | ) | |
| capacity; | ) | |
| OFFICER MICHELLE BOEHRS, | ) | |
| individually and in her official | ) | |
| capacity; | ) | |
| OFFICER BILL BUSHONG, | ) | |
| individually and in his official | ) | |
| capacity; and | ) | |
| CITY OF STURGIS, | ) | |
| | ) | |
| Defendants. | ) | |

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

II.   STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.  FACTS AND PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . .  4

IV.   DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
      A.   QUALIFIED IMMUNITY. . . . . . . . . . . . . . . . . . . . . . . . . . .  15
      B.   LAW ON PAT-DOWN SEARCH. . . . . . . . . . . . . . . . . . . . .  18
      C.   PAT-DOWN SEARCH OF CHERY LUCERO. . . . . . . . . . . . .  20
      D.   LAW ON STRIP SEARCHES. . . . . . . . . . . . . . . . . . . . . . . .  23
      E.   STRIP SEARCH OF CHERY LUCERO.. . . . . . . . . . . . . . . . .  25
      F.   LAW ON BODY CAVITY SEARCHES. . . . . . . . . . . . . . . . . .  30
      G.   BODY CAVITY SEARCH OF CHERY LUCERO. . . . . . . . . . .  31
      H.   CITY OF STURGIS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34
      I.   NEGLIGENCE CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

V.    ORDER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

# I.    INTRODUCTION

Plaintiff's amended complaint alleges her Fourth Amendment constitutional rights were violated as the result of a pat-down search and subsequent body cavity searches conducted by Sturgis Police Officer Michelle Boehrs on August 5, 2006. (Docket 22). The amended complaint also asserts claims of negligent hiring, training, and supervision against Police Chief James G. Bush, Police Officer Bill Bushong, and the City of Sturgis, South Dakota. <u>Id.</u> Defendants' answer denies the significant allegations of plaintiff's amended complaint and asserts (1) the individual defendants are entitled to qualified immunity and (2) the claim against the City of Sturgis is barred by the statute of limitations. (Docket 23). Following completion of discovery, defendants filed a motion for summary judgment. (Docket 24). Briefing by the parties has been completed and the motion is ripe for resolution.

# II.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing a genuine issue of material fact exists. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. <u>Id.</u> at 248. Accordingly, "the mere existence

of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. Id. However, the moving party is entitled to judgment as a matter of law if the nonmoving party has failed to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). In order to withstand a motion for summary judgment, the nonmoving party "must substantiate [her] allegations with 'sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy.' " Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) (citing Gregory v. Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992), cert. denied, 507 U.S. 913 (1993)). "A mere scintilla of evidence is insufficient to avoid summary judgment." Moody, 23 F.3d at 1412. The key inquiry is "whether the evidence presents

a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

## III.   FACTS AND PROCEDURAL HISTORY

The undisputed material facts are gathered from plaintiff's amended complaint (Docket 22), defendants' answer to the amended complaint (Docket 23)[1], defendants' statement of undisputed material facts (Docket 26), plaintiff's statement of disputed and undisputed material facts (Docket 30), and plaintiff's objections to defendants' statement of material facts (Docket 31). Other citations to the record will be made where appropriate.

On August 5, 2006, plaintiff Chery A. Lucero was visiting Sturgis, South Dakota, during the Sturgis Rally.[2]  (Docket 22 at #2). A pickup was being driven by her husband, Ernie, and the other passengers included her husband's cousin, Ronald, her husband's uncle, Nester, and her father-in-law, Lupe.[3]  (Docket 26 at #1). The pickup was a full size four-door Ford,

---

[1]Where defendants' answer (Docket 23) admits the allegations of plaintiff's amended complaint (Docket 22), the references will be to the amended complaint.

[2]"During the Rally, the City [of Sturgis] closes four to five blocks of Main Street for use only by motorcycle traffic. Estimates of attendance at the 1999 Rally include 275,000 to 300,000 people." Sturgis Area Chamber of Commerce and the City of Sturgis v. Sturgis Rally & Races, Inc., and Sturgis Bike Week, Inc., Civ. 00-5023-KES, District of South Dakota, memorandum opinion and order. (Docket 38 at ¶ 5).

[3]Because the occupants all had the same last name "Lucero," they will be identified individually by their first name for convenience and clarity.

with a bench front seat.  Id.  The pickup had a popup camper on the back.
Id.

Chery was sitting in the center of the front seat and the cup holder in front of her held an open beer container.  Id. at #2.  Traffic was heavy, bumper-to-bumper, and the pickup, with the windows down, was moving through town at a couple of miles an hour.  Id. at #3.  Foot patrol officers observed the open beer container and directed the vehicle to pull over.  Id.  Officer Bill Bushong was the team leader for the foot patrol team.  Id.  The occupants of the pickup were told they were being pulled over for having an open container.  Id.  According to the incident report which logs dispatch calls, the stop of the pickup occurred at 4:50 p.m.  Id.

Ronald was asked to step outside of the vehicle, and the others stayed in the pickup until they were asked by the officers to get out.  Id. at #5.  Chery was "within the wingspan" of Ronald, who had been seated behind the driver.  Id. at #4.

During a pat-down search of Ronald, Officer Bushong removed a knife from Ronald's pocket.  Id. at #6; see also Docket 27-1, p. 5.  During the pat-down, Officer Bushong felt a wad of paper currency in Ronald's left pocket, along with a Chapstick.  (Docket 26 at #7).[4]  When asked what was in his pocket, Ronald was "very nervous, he kept putting his hand into that pocket."  Id.  Officer Bushong's testimony described the following:

---

[4]Plaintiff objects to the following factual summary (Docket 31), asserting these facts are not relevant to her claim or the disposition of defendants' summary judgment motion.  However, plaintiff has not presented any specific facts to the contrary as required by Fed. R. Civ. P. 56(e)(2) and D.S.D. Civ. LR 56.1(D).

A. And I asked him, "Sir, please don't put your hand in your pocket." And he removed his hand, and then–then again he went into his pocket and he just stuck his hand in his pocket like he was gripping something in his hand.

Q. Were you concerned at that point?

A. I was concerned at that point, and I said, "Sir, what are you doing? What are you doing?" And I asked him to pull his hand out. He took his hand out, and then he–I asked him, "Would you just please empty your pocket out." And when he emptied his pocket out quite a bit of white powder substance dumped out of his pocket and onto the concrete. And then he had a handful of cash, one dollar bills, and looking at the currency what he had was [sic] he had a white powdery substance folded in a one dollar bill.

Q. In a bindle, so to speak?

A. A bindle, yes.

Q. What did you believe that substance to be?

A. Cocaine.

Id. When asked what the substance was, Ronald acknowledged it to be cocaine. Id. at #8. Officer Bushong wrote Ronald a citation for possession of a controlled substance. Id.

After some time, the other occupants were asked to get out of the vehicle. (Docket 27-7, p. 50). Chery and her husband, Ernie, went over to the curb side of the pickup about twelve to fifteen feet away. Id. Ernie then walked back toward the officers asking "what's going on." (Docket 27-8, p. 51). The officers directed Ernie to go back to the general area where Chery, Lupe, and Nester were standing. Id. The four of them remained together

6

by the curb, "almost in the crowd." Id. at p. 63. They were never told not to leave. Id. at p. 64.

Because of the admission by Ronald, Officer Adam Martin was dispatched to the area shortly after 5 p.m. for a "K9 Deployment." (Docket 26 at #9). Officer Martin was a certified narcotics and drug detection police service dog handler with the Sturgis Police Department. Id. Officer Martin photographed the white substance and field tested it. Id. The substance tested positive for cocaine. Id. at #11.

Detective Drew Grotti was called to the scene and arrived shortly after Officer Martin. Id. at #10. Detective Grotti was the drug detective for the City of Sturgis. Id. Detective Grotti spoke with Officer Bushong and then spoke with Ronald after reading him his Miranda[5] rights. Id. Ronald told the detective that the substance was cocaine and he had last used it two days before. Id. Ronald also told the detective he had used marijuana the night before and maybe a few days earlier. Id.

Officer Martin showed the positive field test to Detective Grotti. Id. at #12. Officer Martin used his trained dog to conduct an exterior sniff of the pickup since Ronald had admitted the white substance was cocaine. Id. at #9. The drug dog sniffed the exterior of the truck and gave a positive alert at the door to the camper topper on the pickup. Id. #12. A thorough search

---

[5]Miranda v. Arizona, 384 U.S. 436 (1966).

of the vehicle revealed no additional contraband. (Docket 22 at #7).
According to Officer Martin, once a drug dog gives a positive alert during a
deployment, all suspects/subjects involved are thoroughly searched as
contraband can be hidden in small areas on a person. (Docket 26 at #14).

As a result of the stop of the vehicle, all the occupants were eventually
searched. (Docket 22 at #4). Several of the other men had knives in their
pockets. (Docket 26 at #6). These were little pocket knives like "old guys
carry knives for." (Docket 27-8, p. 52). Chery did not know if any of the
men had knives. (Docket 26 at #6).

At some point, Ernie asked to use the restroom. (Docket 27-8, p. 64).
The officers then conducted a pat-down search of Ernie and an officer
walked Ernie over to a restroom. Id. No additional search of Ernie occurred
at the restroom. (Docket 27-9, pp. 92-93).

Officer Bushong directed Officer Michelle Boehrs, a female officer, to
come to the scene to search Chery. (Docket 26 at #14 and #15). Officer
Boehrs responded to the dispatch at 5:14 p.m. Id. As she approached
Chery, Officer Boehrs wore protective gloves on both hands. (Dockets 27-8,
p. 73 and 27-9, p. 90). Chery was wearing a pair of denim jean shorts,
underwear, an underwire bra, a shirt, and flip flops. (Dockets 27-8, p. 72
and 27-9, pp. 75, 76, 78, and 82). Officer Boehrs conducted an extensive

pat-down search of Chery.[6]  (Docket 26 at #15).  This outer body pat-down

search was conducted in public view, with the general public watching.

(Docket 30 at #22).  "There were a lot of people around and it seemed like

they just kept gathering."  (Docket 27-11, p. 121).  During the search, Chery

explained that her nipples had been pierced and she had several sore spots

around her breasts and asked the officer to be careful of those areas.

(Docket 26 at #15).  The pat-down search included inspection of Chery's

hair, waistband of her shorts, pockets, bra edge, between her breasts over

the top of her shirt, and feet.  Id.  At no time during the pat-down did Officer

Boehrs look into Chery's underwear, reach into the crack of Chery's

buttocks, or down the front of her pants.  Id.  During the pat-down Officer

Boehrs appeared nervous and said, "I don't know what I'm doing.  I've never

done this before."  (Docket 27-9, p. 75).  No contraband was found.  (Docket

26 at #15).

Sometime during or after the completion of the pat-down search,

Chery asked to use the restroom.  (Docket 30 at #26).  Even though Chery

had already been patted down, Officer Bushong thought it was necessary to

direct someone to accompany her to the restroom because he was

concerned about potential contraband.  (Docket 26 at #17).  As Chery and

[6]The drug dog was never brought over to Chery to sniff around her for
the presence of drugs.  (Docket 27-11, p. 129).

Officer Boehrs started to walk across the street to the restroom, another officer stopped them. (Docket 27-8, p. 81). This other officer asked if Officer Boehrs had already "checked me or patted me," but Chery did not know the exact terminology. Id. In response, Officer Boehrs said "everywhere but there" and with her eyes indicated down toward Chery's genital area. Id. at pp. 81-82. In response, the other officer said, "you can do that over there" waving in the direction of the restroom. Id. at p. 81.

By the time Chery headed toward the restroom, Ronald had already been taken to the jail. (Docket 27-9, p. 31). Officer Boehrs directed Chery to a porta potty located in an alley behind the Broken Spoke Saloon in Sturgis. (Docket 30 at #2). Officer Boehrs accompanied Chery to a handicapped porta potty toilet, which was large enough to accommodate two people.[7] (Docket 26 at #18).

Officer Boehrs opened the door, let Chery in first, and then the officer closed the door behind them and latched it. (Docket 27-9, p. 85). As Chery pulled her shorts down and was in the process of sitting on the commode, Officer Boehrs told her to "[w]ait." Id. at p. 86. Then, "[w]ith her hand [Officer Boehrs] kind of made a circle in the air." Id. Officer Boehrs "[m]ade

---

[7]What occurred in the porta potty is disputed between plaintiff and Officer Boehrs, but for summary judgment purposes, the court must view the evidence in the light most favorable to plaintiff as the nonmoving party. Anderson, 477 U.S. at 256.

the circling gesture and said 'I have to check you.' " Id. at p. 87. "[Officer Boehrs] walked toward me. She put her forearm kind of on the small of my back to indicate she wanted me to lean forward . . . She kind of gave me the gesture or a push, a nudge." Id. Chery stopped in a half squatting position, with her right hand holding on to the rail. Id. at p. 89. While wearing the latex gloves, Officer Boehrs digitally penetrated Chery, both vaginally and anally. (Docket 30 at #2; see also Docket 27-9, p. 90). Chery described the insertion as "painful," she was "a little bit shocked" and "uncomfortable." (Docket 27-11, p. 122). The penetration took two to three seconds. (Docket 27-9, p. 90). Officer Boehrs then took the gloves off and threw them in the trash. Id. These were the same gloves Officer Boehrs wore to conduct the earlier pat-down search. Id. at p. 95.

After that, Chery sat down to urinate and because it was taking so long made a comment like "well, now I have stage fright." Id. p. 91. After a few more moments she was then able to urinate. Id. "All I remember feeling is now I can't pee and I just want to get out of here." Id. Once they returned to the area of the other officers, Officer Boehrs was released and cleared the area, according to dispatch, at 5:30 p.m. (Docket 27-22).

Plaintiff was not charged or arrested for any crime prior to or following the search of her person. (Docket 22 at #9).

At all times relevant to this case, James G. Bush was the Chief of Police for the City of Sturgis, Sturgis Police Department ("SPD"), and responsible for the hiring, training and supervision of all law enforcement personnel employed by the SPD, whether regularly or specially employed. Id. at #10 and #16. It was the duty of defendant Bush to ensure proper hiring, training, supervision, policies and procedures were implemented by the SPD. Id. at #17. Defendant Bush and the SPD had a duty to adequately hire, monitor, train and supervise its employees. Id. at #34.

It was the duty of defendants Bush and the SPD to implement policies and procedures which did not violate the constitutional rights of plaintiff. Id. at #26. It was the duty of the defendants to ensure plaintiff was not subjected to unlawful intrusive, humiliating and harmful searches of her body and person. Id. at #27.

Officer Michelle Boehrs was a state certified reserve officer employed by the SPD on August 5, 2006. (Dockets 22 at #11 and #12 and 23 at #5). Officer Bushong was not a regularly employed officer with the SPD, but was a "special officer" deputized by Chief Bush for the Sturgis Rally. (Docket 22 at #13). Bushong was regularly employed as a Game, Fish and Parks Wildlife Conservation Officer. Id.

At all times relevant to this case, defendants Bushong and Boehrs were working as law enforcement officers for the SPD, acting under the color

12

of law and under the color of authority of law as officers of the police department.  Id. at #15.  At all times during the stop, detention, and search of plaintiff, defendants Bushong and Boehrs were acting under the color and authority of law as law enforcement officers of the SPD.  Id. at #25.

During the time period relevant to this case, defendant Bush and the City of Sturgis implemented no rules, policies or procedures which related to "strip searches" and "body cavity searches," and law enforcement officers were not trained on these issues.  (Docket 30 at #8).  Chief Bush acknowledged his department had no written policies or procedures on strip searches or body cavity searches.  (Docket 27-3, p. 107).  Rather, "we basically did not do them and it would have to be at my okay to do them." Id.

Defendant Bushong, as a Sturgis police officer for the nine-day period of the Sturgis Rally, had never been provided with a copy of the policies and procedures of the SPD.  (Docket 30 at #11).  Defendant Boehrs, as a reserve officer, had never been provided with a copy of the policies and procedures of the SPD, nor was she ever required to read them.  Id. at #12.

On January 18, 2007, a notice of prerequisite of action for damages on behalf of plaintiff was mailed to Mayor Mark Ziegler by certified mail, return receipt requested.  (Docket 22 at #18).  It was received by Nancy J. Nelson on behalf of the mayor on January 19, 2007.  Id.

## IV. DISCUSSION

The Civil Rights Act, codified at 42 U.S.C. § 1983, provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

It is now beyond dispute that "the Federal Constitution, by virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers." New Jersey v. T.L.O., 469 U.S. 325, 334 (1985) (citing Elkins v. United States, 364 U.S. 206, 213 (1960); *accord* Mapp v. Ohio, 367 U.S. 643 (1961); Wolf v. Colorado, 338 U.S. 25 (1949)). "We have recognized that even a limited search of the person is a substantial invasion of privacy." T.L.O., 469 U.S. at 337 (citing Terry v. Ohio, 392 U.S. 1, 24-25 (1967)).

Determining the reasonableness of any search involves a twofold inquiry: first, one must consider "whether the . . . action was justified at its inception," [and] second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place . . . ."

Id. at 341 (citing Terry, 392 U.S. at 20).

In this action, plaintiff asserts her Fourth Amendment rights were violated by the defendants when she was subjected to a progressive series of intimate searches of her person. (Docket 22). From least intrusive to most intrusive, those are identified as follows: a "pat-down search" of her body, but outside of her clothing; a "strip search" involving the viewing of her

14

genital region and buttocks without touching; and a "body cavity search" consisting of a digital probing within her vagina and anus. For continuity, those search terms will be used throughout the remainder of this decision.

## A.    QUALIFIED IMMUNITY

The purpose of the qualified immunity defense is to shield a government official from suit rather than merely to serve as a defense to liability. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The test is "whether a reasonable officer could have believed [the search] was lawful, in light of clearly established law and the information the [arresting] officers possessed." Anderson v. Creighton, 483 U.S. 635, 641 (1987).

> Qualified immunity is best understood by reference to the basic analysis offered by Mitchell v. Forsyth, 472 U.S. 511 (1985). There the Court made clear that the issue on qualified immunity is separate from the merits. The issue on the merits is whether the officer violated the law when the arrest was made, whereas the immunity question is whether the officer violated clearly established law when the arrest was made.

Gainor v. Rogers, 973 F.2d 1379, 1383 (8th Cir. 1992) (emphasis in original).

Evaluating qualified immunity is an objective test: defendants are entitled to qualified immunity "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). For a right to be clearly established,

15

"[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640.

"If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Harlow, 457 U.S. at 818-819. "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." Id. at 819. "Qualified immunity protects a government official from liability in a section 1983 action unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." Richmond v. City of Brooklyn Center, 490 F.3d 1002, 1006 (8th Cir. 2007) (citing Henderson v. Munn, 439 F.3d 497, 501 (8th Cir. 2006)).

In determining whether an officer is entitled to qualified immunity, the court must first determine "whether the officer's conduct violated a constitutional right, and second whether that right was clearly established at the time of the deprivation 'in light of the specific context of the case.'" Id. at 1006 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). "A right is clearly established only if the contours of the right are so defined at the time

of the incident that a reasonable officer in the defendant's position would have understood that what he was doing violated the law." Id. at 1007 (referencing Parks v. Pomeroy, 387 F.3d 949, 957 (8th Cir. 2004)). " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " Id. (citing Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004)).

Resolution of the qualified immunity defense in the summary judgment context requires a step-by-step analysis. First, the court must determine whether the plaintiff has alleged the violation of a constitutional right. See Cross v. City of Des Moines, 965 F.2d 629, 631-33 (8th Cir. 1992). Second, the court must determine whether the right was "clearly established" at the time of the alleged violation. Id. Third, if the constitutional right was clearly established, the court must determine whether there are material facts in dispute regarding the objective reasonableness of the defendant's conduct in light of the law and the facts known to the defendant at the time. Id. Lastly, if the facts are undisputed, and the defendant could be found to have acted reasonably if the conduct is viewed objectively, then summary judgment must be granted for the defendant. Id.

With this framework in mind, the court must analyze each of the constitutional violations asserted by Chery to determine if the right to be

free from each type of search was clearly established as of August 5, 2006, so a reasonable officer would understand the conduct alleged was violating a constitutional right protected under the Fourth Amendment.  <u>Richmond</u>, 490 F.3d at 1006-07 (citing <u>Katz</u>, 533 U.S. at 201 and <u>Parks</u>, 387 F.3d at 957).

**B.    LAW ON PAT-DOWN SEARCH**

On August 5, 2006, the law was clearly established that a police officer was entitled to perform a pat-down search only if an objectively reasonable officer held a reasonable suspicion a person with whom the officer comes in contact may be potentially armed and dangerous.  <u>See</u> <u>Terry</u>, 392 U.S. 1 (1968); <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 373 (1993); and <u>United States v. Clay</u>, 640 F.2d 157 (8th Cir. 1981).

This suspicion must be particularized to the individual whom the officer intends to search.  <u>See</u> <u>Ybarra v. Illinois</u>, 444 U.S. 85, 91 (1979) ("a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."); <u>Clay</u>, 640 F.2d 157, 160 (8th Cir. 1981) (the officer "had no factual data about appellant that would have given rise to a probability of illegal activity."); <u>United States v. Flett</u>, 806 F.2d 823, 827 (8th Cir. 1986)

(declining to adopt the "automatic companion" search rule)[8]; United States

v. Menard, 95 F.3d 9, 11 (8th Cir. 1996) ("Although some circuits have held

that all companions of an arrestee may automatically be frisked for

weapons, see United States v. Berryhill, 445 F.2d 1189, 1193 (9th Cir.

1971), we rejected that rule in Flett [806 F.2d 823 (8th Cir. 1986)], applying

instead the Fourth Amendment's traditional, totality-of-the-circumstances

analysis.  It is relevant that one member of a group has been arrested, but

that does not automatically give rise to a reasonable suspicion that the

others may be armed and dangerous."); and State v. Sleep, 590 N.W.2d 235,

239 (S.D. 1999) ("So long as the officer is entitled to make a forcible stop,

and has reason to believe that the suspect is armed and dangerous, he may

conduct a weapons search limited in scope to this protective purpose.").

This remains the law today.  See Arizona v. Johnson, ____ U.S. ____,

129 S. Ct. 781 (2009).  "To justify a patdown of . . . a passenger during a

traffic stop, however, just as in the case of a pedestrian reasonably

suspected of criminal activity, the police must harbor reasonable suspicion

that the person subjected to the frisk is armed and dangerous." Id. 129 S.

Ct. at 784.

---

[8]In rejecting the "automatic companion" rule, the court in Flett
specifically said "[i]t should be noted that this court in no way condones the
policy of the sheriff's officer [sic] which provides that all males present at
arrests . . . are to be subjected to a cursory pat-down search." Id. at 829, n. 9.

## C.    PAT-DOWN SEARCH OF CHERY LUCERO

There is no doubt that the officers had reasonable suspicion to stop the pickup for violating the open container law, as even a minor traffic offense is grounds for an investigative stop.  United States v. Sallis, 507 F.3d 646 (8th Cir. 2007); United States v. Eldridge, 984 F.2d 943 (8th Cir. 1993).  As Ronald was the first passenger out, the officers were likewise entitled to conduct a pat-down search of him because he was an unknown entity to them.  Terry, 392 U.S. 1 (1968).

To conduct such a search of plaintiff, an objectively reasonable officer must have an individualized particular suspicion she may be armed and dangerous.  Id.  Defendants assert the reasonable suspicion to justify a pat-down of plaintiff included (1) a pocket knife on Ronald, (2) a pocket knife on one or more of the other men in the group, and (3) Ronald's possession of a small quantity of cocaine.  While the court questions whether possession of a small pocket knife like "old men might carry" would justify a pat-down of other members of a group, that factor is not critical at this juncture of the analysis.

It is significant that the officers did not pat-down Chery immediately upon her exiting the pickup.  Rather, she and the three other occupants of the pickup were either instructed or allowed to move from the pickup over to the curb area approximately twelve to fifteen feet away.  This was on the

20

opposite side of the pickup from where the officers were focused on Ronald. Chery and the others remained in that area for several minutes, almost as part of the gathering crowd of spectators watching the arrest of Ronald and the dog search of the pickup. It was nearly fifteen minutes before Officer Boehrs, a female officer, was called by Officer Bushong to come to the scene and another fifteen minutes before she arrived. The circumstances surrounding that thirty-minute time period are vague. No one testified that one of the officers was assigned to keep Chery and the others under surveillance or, in fact, if that actually occurred. From the evidence presented, the officers on the scene, including Bushong, Martin, and Grotti, were more concerned about Ronald and the potential for drugs hidden within the pickup.

The pat-down search of Chery was not justified where no other contraband was discovered during the search of the pickup and camper. Officer Martin's testimony that once a drug dog gives a positive alert for narcotics, all members of the group are to be thoroughly searched is, without more detail, clearly contrary to the "automatic companion" holdings of the Eighth Circuit in Flett and Menard and the South Dakota Supreme Court in Sleep.

The pat-down search of Chery must initially be based on a legitimate, reasonably held belief that she potentially may be armed and dangerous.

Under the totality-of-the-circumstances analysis, reaffirmed by the Eighth Circuit in Menard and endorsed by the South Dakota Supreme Court in Sleep, what occurred during this thirty-minute time period "materially weakens the officers' testimony that a reasonable basis existed on their part for fear of their safety." United States v. Miller, 546 F.2d 251, 254 (8th Cir. 1976). Whether the officers reasonably believed that Chery was potentially dangerous remains to be seen as there are material facts in dispute which must be resolved by a jury.

Reasonable police officers would have known or should have known that their conduct toward Chery was governed and prohibited by clearly established law. See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982). "Whether a given set of facts entitles the defendant to qualified immunity is a question of law which may be decided on summary judgment. However, if there is a dispute over facts that might affect the outcome of the suit under the law of qualified immunity, there can be no summary judgment." Creighton v. Anderson, 922 F.2d 443, 447 (8th Cir. 1990) (citations omitted). "Once a genuine issue of material fact is found to exist, the defense of qualified immunity shielding the defendant from trial must be denied." Gainor, 973 F.2d at 1385. Since the alleged constitutional violation is supported by well defined law, the qualified immunity defense must fail.

D.    **LAW ON STRIP SEARCHES**

On August 5, 2006, the law was clearly established that a law enforcement officer was entitled to perform a strip search, that is a visual inspection of plaintiff's genital area or buttocks, only (1) following a lawful arrest and (2) only if an objectively reasonable officer held a reasonable suspicion that a person may be secreting a concealed weapon or contraband within those external regions of her body.  See United States v. Robinson, 414 U.S. 218 (1973); Bell v. Wolfish, 441 U.S. 520 (1979); Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1273 (7th Cir. 1983) ("[E]nsuring the security needs of the [officer] by strip searching [an arrestee] [is] unreasonable without a reasonable suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed."); Jones v. Edwards, 770 F.2d 739 (8th Cir. 1985) (strip/body cavity search of arrestee who refused to sign summons and became belligerent toward arresting officers was unconstitutional); Ward v. County of San Diego, 791 F.2d 1329, 1333 (9th Cir. 1986) (held that a visual body cavity search pursuant to a blanket strip search policy on persons arrested for a minor misdemeanor offense and conducted prior to a determination of whether the arrestee could be released on her own recognizance, violated the Fourth Amendment unless the defendant could show it was reasonable under the circumstances); Burns v. Loranger, 907 F.2d 233, 236 (1st Cir. 1990)

("[u]pon witnessing the commission of a felony offense in Burns' immediate presence, [the officer] possessed sufficient reliable information to support an objectively reasonable belief that there was a fair probability that readily-disposable incriminating evidence would be found on her person."); and State v. Hirning, 592 N.W.2d 600, 604 (S.D. 1999) ("[p]assengers, no less than drivers, possess a reduced expectation of privacy with regard to the property that they transport in cars, probable cause to search a car will not by itself justify a body search of all the passengers. Any inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person.") (internal quotations and citations omitted).

Again, the reasonable suspicion must be particularized to the individual whom the officer intends to strip search. See Ybarra, 444 U.S. 85 (1979); Wolfish, 441 U.S. 520 (1979); Burns, 907 F.2d 233 (1st Cir. 1990); Justice v. City of Peachtree City, 961 F.2d 188, 193 (11th Cir. 1992) ("We must determine whether the officers, based on the totality of the circumstances, had a particularized and objective basis for suspecting the particular person[ ] [searched] of criminal activity.") (internal quotation marks omitted); Swain v. Spinney, 117 F.3d 1, 7-8 (1st Cir. 1997) ("at least the reasonable suspicion standard governs strip and visual body cavity searches in the arrestee context . . . . an objective officer would have had a

reasonable suspicion [the arrestee] was concealing drugs or contraband on her person."); and <u>Hirning</u>, 592 N.W.2d 600 (S.D. 1999).

The Eighth Circuit reconfirmed the individualized reasonable suspicion rule in the year following Ms. Lucero's search. "The Fourth Amendment reasonableness of a strip search turns on 'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.' " <u>Richmond v. City of Brooklyn Center</u>, 490 F.3d 1002, 1006 (8th Cir. 2007) (citing <u>Wolfish</u>, 441 U.S. at 559). The <u>Richmond</u> court reaffirmed that an officer must have "reasonable suspicion to conduct a strip search." <u>Id.</u> (referencing <u>Jones</u>, 770 F.2d at 741-42 (finding a strip search of an arrestee violated the Fourth Amendment where the authorities had no reasonable suspicion of concealed weapons or contraband).

**E.    STRIP SEARCH OF CHERY LUCERO**

Whether constitutionally permissible or not for purposes of this analysis, Officer Boehrs was instructed by Officer Bushong to conduct a pat-down search of plaintiff. This was an extensive pat-down search, with the officer making physical contact with Chery's hair, waistband of her denim shorts, pockets, bra edge along the underwire, between her breasts over the top of her shirt, and feet. Officer Boehrs even went so far as to

remove Chery's flip flops to determine if she might have something hidden under her feet or within the material of her footwear.

It is the "individualized reasonable suspicion" requirement which is important for the analysis before the court. Doe ex rel. Doe v. Little Rock School District, 380 F.3d 349 (8th Cir. 2004). Plaintiff was neither nervous nor defensive during the pat-down search. There is no indication that she engaged in any activity or movement intended to deflect the officer's attention or avoid the search of her person. This pat-down search disclosed nothing out of the ordinary, and neither Officer Bushong nor Officer Boehrs testified that Officer Boehrs' physical touching of plaintiff's body prompted the officers to believe that Chery may otherwise be secreting either a weapon or contraband under her clothing. "These searches [in and around the pickup and the pat-down search] revealed nothing. This lack of revealed evidence undermines the reasonableness of [the officer's] belief that [Chery] possessed drugs." Evans v. Stephens, 407 F.3d 1272, 1280 (11th Cir. 2005). At no time was Chery arrested.

Unlike Burns, there is no evidence that Chery was actively engaged in the use or distribution of cocaine or any other drug. Nor was there any evidence of flight or other conduct to avoid detection of seemingly criminal misconduct. See State v. Hodges, 631 N.W.2d 206 (S.D. 2001). Unlike Hirning, there is no allegation that the small quantity of cocaine found on

Ronald belonged to anyone but Ronald. There were no other drugs found anywhere within the pickup or camper or on any of the other male passengers.

Like Swain, Chery was a female detainee in the company of Ronald, a male who was in possession of a small quantity of an unlawful substance. Yet neither Chery's husband, uncle, nor father-in-law were subjected to a strip search. The court is not suggesting they should have been strip searched but by the evidence presently under consideration, the police officers apparently did not believe sufficient grounds existed to conduct such a search. Even though Ernie asked permission to go to the restroom, there is no evidence in this record that the officer who accompanied Ernie to the restroom joined him in the stall to ensure Ernie did not secretly dispose of any contraband.

Defendants would have this court rely on Officer Martin's testimony that people can hide contraband in small areas on their bodies. But this is merely a conclusory statement.[9] In this record, there is no evidence, direct or circumstantial, that Chery was either a courier, user, or drug dealer.

---

[9]Even if Officer Martin's statement is accurate, it would still not provide the "particularized suspicion . . . which the law requires for so intrusive and demeaning an investigative procedure as a strip/body cavity search." Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986) (internal citation and quotation marks omitted).

"Nowhere [have the defendants] demonstrated that the incidence of items found in the vaginal cavities of women was so much greater than that associated with items secreted in the anal cavities of men to justify the grossly disparate search treatment." Mary Beth G., 723 F.2d at 1274.

Notwithstanding the lack of any objective indices of criminal conduct, Officer Boehrs, under the direction of Officer Bushong or some other unnamed officer or on her own initiative, chose to accompany Chery to the porta potty. Prior to what would initially be a strip search, Officer Boehrs did not place plaintiff under arrest. She lacked probable cause to effectuate an arrest, as there was no evidence at this point that Chery was engaged in any criminal misconduct whatsoever.

While in the porta potty, Officer Boehrs required Chery to submit to a visual inspection of her vaginal and rectal areas. The officer required Chery to turn around, bend over, and lean with her arm on a handicap rail with her shorts pulled down. This was a strip search under the law discussed in detail above. There is no testimony that Officer Boehrs observed anything out of the ordinary during this strip search.

Each of the cases reviewed by this court addressed the propriety of a strip search after an arrest. "A court declaration is a message not only to the parties but also to the public and has significant educational and lasting importance. It would be another marker along the road to implementation

of Fourth Amendment rights." Konop for Konop v. Northwestern School District, 26 F. Supp. 2d 1189, 1193 (D.S.D. 1998). Neither party has presented the court with any case authority which allows an officer to conduct a strip search of a detainee, who has not been arrested and who exhibited none of the traditional factors used by law enforcement officers to focus on an individual believed to be engaged in criminal conduct.

"[T]here can be no question that a strip search, by its very nature, constitutes an extreme intrusion on personal privacy, as well as an offense to the dignity of the individual." Burns, 907 F.2d at 235, n. 6. Defendants' qualified immunity defense must fail since reasonable police officers should or would have known the constitutional principles governing their conduct were clearly established and prohibited such action. See Harlow v. Fitzgerald, 457 U.S. 800, 818-819 (1982).

Whether the strip search occurred and the manner in which it allegedly developed are material facts in dispute which must be resolved by a jury. Because there is a dispute over facts that might affect the outcome of the suit under the law of qualified immunity, defendants are not entitled to summary judgment. See Creighton, 922 F.2d at 447. The defendants' motion for summary judgment on the basis of qualified immunity must be denied. See Gainor, 973 F.2d at 1385.

## F.	LAW ON BODY CAVITY SEARCHES

As with the analysis of the clearly established right to be free from a strip search, each of the cases reviewed by the court addressing the propriety of a body cavity search occurred <u>after</u> arrest.  The law was clear prior to August 5, 2006, that a body cavity search, without consent and without a search warrant, must be done only following an arrest (or pending arrest) upon probable cause, with a reasonable certainty that the sought after evidence might be destroyed unless the search and anticipated seizure occurs without delay.  <u>See</u> <u>Schmerber v. California</u>, 384 U.S. 757 (1966); <u>United States v. Oyekan</u>, 786 F.2d 832, 839 at fn 13 (8th Cir. 1986) ("a body cavity search must be conducted consistently with the <u>Schmerber</u> factors, even though such a search does not technically require piercing the skin, because both the degree and kind of intrusion involved are of analogous proportions"); <u>Vaughan v. Ricketts</u>, 950 F.2d 1464, 1468-69 (9th Cir. 1991) (digital body cavity searches must "be conducted with reasonable cause and in a reasonable manner. . . . A violation of the Fourth Amendment may be predicated on a finding either that cause was lacking or that the search was conducted in an unreasonable manner"); <u>Amaechi v. West</u>, 237 F.3d 356, 361-62 (4th Cir. 2001) ("West does not allege that he conducted the [body cavity] search in such a manner because of a perceived threat to his or the other officers' safety. . . . Nor did the possibility exist that Amaechi would

attempt to destroy or conceal evidence . . . . Because the invasiveness of Amaechi's search far outweighed any potential justification for the scope, manner, and place under which it was conducted, . . . the search was unreasonable and, therefore, unconstitutional.").

Under exigent circumstances, a body cavity search should be performed by a medical professional in an appropriate medical environment. See Schmerber, 384 U.S. 757 (1966) and Oyekan,786 F.2d 832 (8th Cir. 1986).

## G.    BODY CAVITY SEARCH OF CHERY LUCERO

Officer Boehrs allegedly had already performed a pat-down search and a strip search.  Those searches disclosed nothing of a criminal nature and did not elevate the level of suspicion an objectively reasonable law enforcement officer might have that plaintiff was holding contraband within the recesses of her body.

A jury could reasonably conclude the body cavity "search was highly intrusive without any apparent justification. . . . [and was not conducted] in such a manner because of a perceived threat to [officer safety] . . . . Nor did the possibility exist that [Chery] would attempt to destroy or conceal evidence . . . ." Amaechi, 237 F.3d at 361-62.  The decision to conduct the vaginal and rectal search of plaintiff's body would thus be unconstitutional. Id. at 362.

Separately from the <u>decision</u> to conduct this search is the issue of the <u>manner</u> in which the alleged body cavity search occurred. The law was clear in August of 2006 that a body cavity search must be done in a reasonable manner.[10] See <u>Oyekan</u>, 786 F.2d at 840 ("Also weighing in the balance is the fact that the procedure was performed in a hospital by a physician and did not itself pose health risks to the defendants."). Other circuits have made the same pronouncement in earlier cases.[11]

The evidence in this case is that Officer Boehrs allegedly used only one pair of latex gloves to perform both the pat-down search and the body cavity search in the porta potty. This was the same pair of gloves with which the officer fingered through Chery's hair, touched the bottoms of

---

[10]"[T]he law was clear [in April 2001] that strip searches should be performed in a hygienic fashion and not in a degrading, humiliating or abusive fashion." <u>Richmond</u>, 490 F.3d at 1008. Examples of unreasonably abusive searches referenced by the court in <u>Richmond</u>, included "the drawing of blood 'by other than medical personnel or in other than a medical environment–for example, if it were [done] by police in the privacy of the stationhouse,' because such a search would 'invite an unjustified element of personal risk of infection and pain.' " <u>Id.</u> at 1009 (citing <u>Schmerber</u>, 384 U.S. at 771-72 (cited by <u>Wolfish</u>, 441 U.S. at 560)).

[11]<u>Hurley v. Ward</u>, 584 F.2d 609, 610 n. 1 (2d Cir. 1978) ("If there is reasonable cause to believe contraband has been concealed in a body cavity, the inmate shall be immediately examined . . . by a facility health staff member."); <u>United States v. Lilly</u>, 576 F.2d 1240, 1247 (5th Cir. 1978) ("The body cavity search was conducted by a female medical officer in the prison clinic in the presence of only the medical officer and a female correctional officer."); <u>Daughtery v. Harris</u>, 476 F.2d 292, 295 (10th Cir. 1973) ("the examinations were carried out by trained paraprofessional medical assistants in a designated area and under sanitary conditions.").

Chery's feet, handled the flip flops and opened and closed the porta potty door–all before she used this pair of latex gloves to digitally penetrate Chery's vagina and rectum.  See Bonitz v. Fair, 804 F.2d 164, 173 (1st Cir. 1986) (using a single pair of gloves for multiple searches was unsanitary).[12] While the manner in which the alleged search was conducted was not brutal, it would be intrusive, depersonalizing, and distasteful for any person to be subjected to this kind of search by a stranger in a porta potty in an alley.  Jones, 770 F.2d at 742.

If this body cavity search occurred as plaintiff claims it did, the manner in which the search occurred was unconstitutional.  Okeyan, 786 F.2d 832 (8th Cir. 1986); Evans, 407 F.3d 1272 (11th Cir. 2005) (en banc); and Amaechi, 237 F.3d 356 (4th Cir. 2001).  "[T]he Fourth Amendment itself provided, at the time, sufficient notice that the manner of these particular searches [were] 'unreasonable' in the constitutional sense."  Evans, 407 F.3d at 1278.

The use of a single pair of latex gloves in the manner in which they were allegedly used in this case remains a jury question.  Because there is "a dispute over facts that might affect the outcome of the suit under the law of qualified immunity, there can be no summary judgment."  Creighton, 922

---

[12]In 2004, the Seventh Circuit declared "[a]n unsanitary digital body cavity search could constitute a violation of the Eighth Amendment."  Green v. Hallam, 105 Fed. Appx. 858, 863 (citing Bonitz, 804 F.2d at 169).

F.2d at 447 (citations omitted).  Genuine issues of material fact exist, so the

individual defendants are not shielded by the defense of qualified immunity.

See Gainor, 973 F.2d at 1385.

**H.    CITY OF STURGIS**

A city "may not be sued under § 1983 for an injury inflicted solely by

its employees or agents.  Instead, it is when execution of a government's

policy or custom, whether made by its lawmakers or by those whose edicts

or acts may fairly be said to represent official policy, inflicts the injury that

the government as an entity is responsible under § 1983."  Monell v.

Department of Social Services of City of New York, 436 U.S. 658, 694

(1978).  It is only if a municipal custom or policy has caused the deprivation

of the constitutional right that the municipality may be held liable.  Id. at

690-691.  In this case, the plaintiff must show that "the action that is

alleged to be unconstitutional implements or executes a policy statement, . .

. officially adopted and promulgated by the municipality's officers or that a

constitutional deprivation was visited pursuant to governmental custom

even though such a custom has not received formal approval through the

body's official decisionmaking channels."  Marchant v. City of Little Rock,

Arkansas, 741 F.2d 201, 204 (8th Cir. 1984) (citing Monell, 436 U.S. at 690-

691) (internal quotation marks omitted).  "A § 1983 plaintiff must establish

the existence of a city policy or custom under <u>Monell</u>, <u>supra</u>, in order to

recover against city employees in their official capacities." <u>Id.</u>

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

<u>Swain</u> 117 F.3d at 11 (citing <u>Board of County Comm'rs v. Brown</u>, 520 U.S.

397, 404, (1997) (discussing <u>Monell</u>, 436 U.S. 658 (1978) and progeny).

Defendants admit Police Chief Bush is the official policy maker for the

SPD and, thus, the City of Sturgis, for purposes of this litigation.

Defendants also admit the official policies and procedures manual for the

SPD did not address the issues of strip searches or body cavity searches as

of August 5, 2006. Likewise, defendants admit "there is no prohibition

against strip searches or body cavity searches in the policies." (Docket 25 at

p. 8). Rather, Chief Bush has declared in his deposition that "we basically

did not do them and it would have to be at my okay to do them." (Docket

27-3, p. 107). Neither Officer Bushong nor Officer Boehrs testified they

were aware of this policy.[13]

---

[13]In addition, prior to going on the streets, neither officer was required to read, know, and understand the written policies and procedures of the SPD. Reading the manual would not have been beneficial as there was no statement or prohibition against these types of searches in the manual to begin with.

While Chief Bush may have claimed he was not aware of any such searches under his watch, under the status of the record for summary judgment purposes it seems apparent that strip searches and perhaps even body cavity searches may have been routinely performed by his officers. Officer Martin, as the city's certified narcotics and drug detection police service dog handler, testified that all suspects were thoroughly searched for contraband any time a drug dog gave a positive alert. Officer Bushong likewise instructed Officer Boehrs to accompany plaintiff to the restroom because of the potential for secreted contraband. Again, in the status of the current record, Officer Boehrs apparently acknowledged to another unnamed officer that she had searched plaintiff everywhere except in her private parts, and so the unidentified officer instructed Officer Boehrs to perform a search of that area of plaintiff's body during the trip to the porta potty.

A jury question exists as to whether Chief Bush is credible or whether there was a regular custom or practice within his department to perform strip or body cavity searches. If the answer to the second part of that inquiry is "yes", then unless properly limited, "there was a high probability that unconstitutional searches would result." Doe v. Calumet City, Illinois, 754 F. Supp. 1211, 1223 (N.D. Ill. 1990). It is for a jury to decide whether "police officers are regularly called upon to consider whether and when to conduct strip searches . . . ." Id. at 1224 (internal citation omitted).

The court must "construe the policy statement strictly as against the defendant [Bush], whose responsibility it was to promulgate a clear statement." Id. at 1084. The lack of a clear, enforced statement may very well have allowed a custom or practice to develop within the department and it appears to have been applied against Chery Lucero. Salinas v. Breier, 695 F.2d 1073, 1085 (7th Cir. 1982).

It is well documented that Sturgis sees significant numbers, if not hundreds of drug related arrests each year during the Sturgis Motorcycle Rally. If the evidence develops that it was Chief Bush's specific policy not to allow strip searches or body cavity searches, then the failure to train his officers on these significant constitutional issues may be a "deliberate indifference" so as to be a custom or policy which is actionable under § 1983. City of Canton Ohio v. Harris, 489 U.S. 378, 389 (1989). "[I]n a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Swain, 117 F.3d at 11 (citing Brown, 520 U.S. at 409). Applicable to the record before the court, the United States Supreme Court in Brown said it best:

> The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice–namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of

37

causation–that the municipality's indifference led directly to the very consequence that was so predictable.

Brown, 520 U.S. at 409-10.

While Chief Bush may believe the city does not have a strip search policy, a jury may conclude that the city does have a policy. A jury could find on this record that the policy or custom of the SPD, and thus the City of Sturgis, is that the decision, as to when and whom to strip search without a warrant, is left to the discretion of the field officers. A jury could find that Officers Martin, Bushong, and Boehrs were acting in accord with such a policy or custom at the time of the alleged strip search and body cavity search of plaintiff. Thus, both the city's policy or custom and the failure to properly train its officers may be a direct cause of plaintiff's alleged constitutional injuries. A constitutional violation of the type and nature alleged, if it did occur, is the very type of violation which a properly implemented policy and a properly trained police force would be expected to prevent. Id. at 412. Consequently, the City of Sturgis and its chief of police, James Bush, in his official capacity, may both be liable for plaintiff's civil rights claims under § 1983. Monell.

## I.    NEGLIGENCE CLAIM

Plaintiff has asserted claims in the second count of the amended complaint of negligent hiring, training, and supervision. (Docket 22). Defendants assert that any such tort claims are barred by the applicable

South Dakota statute of limitations. SDCL § 9-24-5 specifically provides: "Any action for recovery of damages for personal injury or death caused by the negligence of a municipality must be commenced within two years from the occurrence of the accident causing the injury or death." This statute means that a cause of action accrues at the time the injury occurs. See Loesch v. City of Huron, 2006 SD 93, 723 N.W.2d 694.

The events which are the basis of plaintiff's complaint occurred on August 5, 2006. The original complaint was not filed until July 29, 2009, nearly three years later. As a matter of law, plaintiff's negligence claim fails because the complaint was not properly served upon the defendant, City of Sturgis, South Dakota, within the two-year time period required by SDCL § 9-24-5, notwithstanding the tolling contemplated by SDCL § 3-21-6. Loesch, 723 N.W.2d at 696.

This determination does not affect plaintiff's civil rights claims as those are governed by South Dakota's three-year statute of limitations, SDCL § 15-2-15.2. Bell v. Fowler, 99 F.3d 262, 266 (8th Cir. 1996). Plaintiff's original complaint was timely filed so as to preserve her § 1983 claims against all defendants.

## V.    ORDER

Based upon the above decision, it is hereby

ORDERED that defendants' motion for summary judgment (Docket 24) is granted in part and denied in part.

IT IS FURTHER ORDERED that as to Count I defendants' qualified immunity defense is denied.

IT IS FURTHER ORDERED that as to Count I defendants' defense relating to the City of Sturgis, South Dakota, and the named officers in their official capacities is denied.

IT IS FURTHER ORDERED that Count II of plaintiff's amended complaint is dismissed with prejudice.

Dated September 1, 2010.

BY THE COURT:

/s/ Jeffrey L. Viken
JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE